**SENATOR ALICIA "CHUCKY" HANSEN, Jessica Tutein Moolenaar, Jackie Buckmire, Miguel Nico, Gonzalo Rivera, Norma Samuel, Raymond E. Richards, Hortense M. Rowe, Mario Moorhead, Lorraine Gibbs, Otto Tranberg, Jennifer S. James, Gerda R. James, Daniel James, Veronica V. France, James Miller, Mary Moorhead, John Farchette, and Leola Graham, Plaintiffs**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Governor Charles W. Turnbull, and Attorney General Iver A. Stridiron, Defendants, and Caribbean Space Technologies, LLC, Intervenor/Defendant**

Civil No. 600/99

Territorial Court of the Virgin Islands

Division of St. Croix

December 22, 1999, Filed
March 19, 2010, Decided

EDWARD HASKINS JACOBS, ESQ., St. Croix, USVI, *Attorney for Plaintiffs.*

MICHAEL S. MCLAURIN, ESQ., V.I. Department of Justice, St. Croix, USVI, *Attorney for Defendants.*

J. DARYL DODSON, ESQ., Moore & Dodson, St. Thomas, USVI, *Attorney for Intervenor.*

ADRIANE J. DUDLEY, ESQ., Dudley, Clark & Chan, St. Thomas, USVI, *Attorney for Intervenor.*

ANDREWS, *Judge*

## MEMORANDUM OPINION

(Filed December 22, 1999)
(Decided March 19, 2010)

### INTRODUCTION

Today, nineteen (19) members of the Virgin Islands community appear before this Court in search of answers to questions novel to Virgin Islands

jurisprudence. They ask this Court to enjoin their Governor from trading away property they claim is the subject of a charitable trust. The nineteen plaintiffs maintain that the historically significant property, known as Camp Arawak, was given to the government to hold in trust for the people, in perpetuity, and that its disposition would constitute a breach of trust. The Twenty-Third Legislature recently passed legislation in an attempt to approve the trade. The Plaintiffs assert that, as beneficiaries of the trust, they will lose ownership of, and the right to enjoy Camp Arawak as a park and recreation site, and to enjoy the historic structures there that link them to their ancestors.

Defendant Government and intervenor Caribbean Space Technologies, LLC, the private entity seeking title to Camp Arawak, assert that: 1) Camp Arawak is not the subject of a charitable trust; 2) Plaintiffs have no right to sue; 3) the recently-passed Act No. 23-0098 authorizes the exchange, notwithstanding any other provision of Virgin Islands law to the contrary; and 4) the proposed exchange is valid under the doctrines of *cy pres* and equitable deviation. The clash between the parties raises routine issues present in any action for injunctive relief, i.e., irreparable harm, balance of hardships, merits, and public interest. Aside from these, it presents other issues totally absent from the jurisprudential history of the Virgin Islands. They are:

1) Whether trust beneficiaries, with no special interest, have standing to sue for enforcement of a charitable trust?

2) a. Whether the conveyance of Camp Arawak to the Government created a charitable trust? and if so,

 b. Whether the proposed transfer of Camp Arawak for non-public use constitutes a breach of trust?

3) Whether Act No. 23-0098 is relevant to this proceeding?

4) Whether the proposed transfer should be approved pursuant to the doctrines of *cy pres* or equitable deviation? and

5) Whether a new trustee should be appointed for Camp Arawak?

For the reasons discussed below, this Court concludes that: A) Plaintiffs have standing to sue as trust beneficiaries and as taxpayers; B) The proposed transfer is a breach of a charitable trust created by the 1974 conveyance of

Camp Arawak to the Government; C) Act No. 23-0098 is irrelevant to this proceeding; D) The doctrines of *cy pres* and equitable deviation are inapplicable to the circumstances of Camp Arawak; and E) Plaintiffs have not established the need for appointment of a new trustee.

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action for injunctive relief against Defendants (the Government), and filed a motion for a temporary restraining order (TRO), on October 7, 1999. On October 8th, the Government filed a motion to dismiss, and Caribbean Space Technologies, LLC (CST) filed a motion to intervene. That same day, this Court held a hearing and: 1) denied the Government's motion to dismiss; 2) issued a TRO against the Government; 3) took the motion to intervene under advisement; and 4) scheduled the matter for an October 14th preliminary hearing.

On October 13, 1999, the Government removed the case to the United States District Court, pursuant to 28 U.S.C. §§ 1441-1442 (1991), claiming that Plaintiffs' complaint was grounded in federal law. On October 15th, Plaintiffs amended their complaint to delete all federal law claims. The District Court remanded the case on October 20th. The next day, this Court extended the TRO to October 28th.

On October 27, 1999, the Government and CST filed answers generally denying Plaintiffs' claims and raising various affirmative defenses. At a hearing that same day, this Court granted CST's motion to intervene. It then moved the Court to dismiss Plaintiffs' case on grounds that Act No. 23-0098, which became law on October 26th, authorized the exchange and that Plaintiffs waived all constitutional challenges to the Act's validity. After arguments, this Court denied the motion and commenced a preliminary hearing. On October 28th, the preliminary hearing was consolidated with trial on the merits, and the TRO was extended to November 10th. The trial proceeded for nine (9) days, concluding with a site visit on November 15th.

The Government, on November 8, 1999, filed a petition with the District Court to appeal the TRO. That petition was granted and the appeal was denied on December 14, 1999. On November 10th, this Court converted the TRO into a preliminary injunction. On November 24th, CST removed the case to the District Court alleging that Plaintiffs had improperly reintroduced federal issues into the case. The District Court

remanded the case on December 2nd. On December 14th, this Court held closing arguments and the matter was taken under advisement.

## FACTS[1]

### 1) Conveyance of Camp Arawak to Virgin Islands Government

During 1974, Valmy Thomas, then-deputy commissioner of the Department of Conservation and Cultural Affairs (Conservation), reported to Plaintiff Hortense M. Rowe, then-commissioner of the department, that Frank Wiesner wished to donate certain property at Estate Great Pond to the Government. Thomas represented that the property could be used to provide a park on the southeastern side of St. Croix and help to prevent youths from becoming at-risk. Rowe took the idea to then-Governor Melvin H. Evans and explained how Camp Arawak could become an integral part of the Virgin Islands Park System. He instructed her to proceed full throttle to prepare "the legal documentation necessary for the acceptance of [the property by] the Government of the Virgin Islands." Trial Tr. 11/02/99 pp. 84 and 111. Pursuant thereto, Thomas developed a plan to place the property into the territorial park system. He discussed the plan with Wiesner, who approved of it. Wiesner had previously approved requests to camp on the site and wanted it open for use as a public park for recreational purposes. Consistent with this purpose, Thomas' plan included provisions for: 1) outdoor sports and recreation activities including softball, volleyball and tennis; 2) a pavilion with benches and tables; and 3) the restoration and preservation of the great house and archaeological sites on the property. Conservation (the predecessor of Housing, Parks, and Recreation) was to implement the plan.

On December 17, 1974, Frank Wiesner conveyed Plot Nos. 5 (4.3 acres) and 6 (10.2 acres) Estate Great Pond, Christiansted, St. Croix (hereinafter Camp Arawak or the Camp) to the Government of the Virgin Islands via a warranty deed. App. pp. 1-4. The deed contains recitals that Wiesner desired that the people of the Virgin Islands and its visitors "shall

---

[1] The facts are derived from all testimony adduced, exhibits admitted, and stipulations in this case from the commencement of the preliminary hearing, on October 27, 1999, to the close of evidence on November 15, 1999. They are also derived from Court observations during the site visits. They consist primarily of those facts material to the issues adjudicated in this opinion. Most of the pertinent facts are not in dispute.

enjoy the benefits of this land and the historic structures located thereon in perpetuity." App. p. 1. It further recites that the Governor and Legislature of the Virgin Islands accepted Camp Arawak in trust for the people "knowing that it is being given to the people in perpetuity for the express and direct purpose of beach, park and other public recreational use." *Id.* The conveyance was

> SUBJECT, to perpetual use for public beach, park, or other recreational facilities and purposes for all of the people of the Virgin Islands of the United States and visitors to its shores.

> TO HAVE AND TO HOLD the foredescribed [sic] property in trust for the people . . . forever.

App. p. 3.

### 2) Description and History of Camp Arawak

Camp Arawak consists of 14.5 acres and is situated on the southeastern shore of St. Croix. App. p. 5. The Camp is bounded by: the beach of Great Pond Bay to the south; Plot No. 4 Estate Great Pond to the west; South Side Road (Route 60) to the north; and Plot Nos. 26, 28, and 6A Estate Great Pond to the east. The bay consists of scattered patch reefs, seagrass beds, and clear shallow waters. It is great for fishing and is protected by a coral barrier reef which maintains continuous calmness of the bay waters.

The terrain of Camp Arawak consists of agricultural land that is relatively flat and grassy with several scattered tamarind trees. There are several historic structures upon it including: an 18th-century neo-classical Great House with a welcoming-arm staircase, a two-story classroom building, remains of a factory and storage buildings, and part of a sugar mill. *See* App. 15. They are made mainly of rock, coral and brick rubble. Hurricane Hugo, in 1989, destroyed the roof of the Great House. There is a continuously eroding ridge (approximately ten feet high) to the south overlooking the beach. Just to the west of Camp Arawak lies a huge salt pond, called "The Great Salt Pond." The pond is rimmed with substantial mangroves, which serve as a bird habitat. The Department of Planning and Natural Resources designated the Great Pond area (which includes Camp Arawak) as an Area of Particular Concern (APC) and as an Area for Preservation and Restoration due to its classification as an area of cultural

and natural significance. Part of Camp Arawak is specifically designated for conservation, recreation, and traditional uses, and the other portion for protection and low-density residential use. It is one of eighteen (18) APCs in the Virgin Islands.

Camp Arawak and other adjacent parcels comprise the Great Pond (pre-historic) Archaeological Site. There is evidence that the Site had been heavily occupied since at least 300 A.D. The southern portion of it, next to the bay, was once an Indian village. The Site is listed on the Register of Archaeological Sites of the Virgin Islands and the National Register of Historic Places. It is the largest aboriginal site on the east end of St. Croix, yet is poorly known. A December 1998 archaeological survey of Camp Arawak and Plot No. 6A (.33 acres) uncovered a surface scatter of 216 pre-historic and historic artifacts.

The Camp is also part of the Great Pond Historic District, which is listed on the Virgin Islands Inventory of Historic Sites. It is described in "Eco Tourist", a text authored by Rudy O'Reilly and Kenneth Olassie Davis. Parents and Teachers use the text for educational purposes, and the Department of Tourism uses it to promote eco-tourism. The District was once a sugar, and later a cotton, plantation active under Danish (1733 to 1917) and pre-Danish rule. It also includes slave quarters which are located on Plot No. 4. Seventy-five African men, women, boys, and girls are listed on an 1803 mortgage, filed with the Recorder of Deeds, on the Great Pond District. These Africans, ancestors of the masses of Virgin Islanders, resided, and worked involuntarily on the plantations.

### 3) Administration and Post-Conveyance Use of Camp Arawak

The Evans administration had set aside funds to implement the development plan for Camp Arawak. However, within one month of conveyance to the Government, the Cyril E. King administration took office. Commissioner Rowe was precluded from implementing the plan, and was eventually replaced. The plan was never implemented, nor has the government ever directly developed or maintained Camp Arawak.

Beginning in the mid-70s, the Government approved the use of Camp Arawak by a non-profit organization, named Arawak Program, Inc. and called "Camp Arawak", to conduct a youth program. The program continued at the Camp until 1998. Due to the extensive use by "Camp Arawak", Plot Nos. 5 and 6 Great Pond came to be known as Camp Arawak. During the last five years at Great Pond, the Arawak Program

served approximately 200 youths annually. They were taught employment skills and engaged in a wide variety of recreational activities on the entire site. Many of them, who were at-risk, turned their lives around for the better. The Program was funded through local and federal grants as well as community donations. The Arawak Program used the Great House as the camp director's residence and as administrative offices. They built a plywood structure on the property and used it as a classroom. *See* App. A15. In 1985, the Arawak Program restored one of the ruins with a $100,000.00 community development block grant, and used it as a two-story classroom building. Due to frequent break-ins at the camp site, the program eventually changed locations.

Currently, Housing, Parks, and Recreation has no plans to develop Camp Arawak. Although he considers the Camp as a park, Commissioner Ira Hobson testified that he cannot afford to develop it. Though his fiscal year 2000 budget is $5.4 million, 90 percent is allocated to personnel. Hobson estimates that it would cost some $50,000.00 to $150,000.00 to install (at the substitute Whim properties) recreational facilities depending on whether one was establishing a simple vs an expansive park.

Although many people were unaware that the Camp was government property, some have used it occasionally for picnicking. The Seventh-Day Adventist Church Pathfinders have camped there twice annually. Kenneth Olassie Davis, a natural resources specialist employed with the University of the Virgin Islands, has conducted numerous educational eco-hikes at the site. He explains to school children and others the significance of the structures on the site (including the adjacent bay), how they relate to the historical and cultural use of the area, and the role played by the ancestors of Virgin Islanders.

Plaintiff Hansen learned of Camp Arawak in the 1970s, and has used it since for recreational purposes. On October 16, 1999, she organized a Camp Arawak revitalization picnic. Hundreds of people attended. They cut the grass, cleared up the area, and engaged in recreational activities. Hansen wishes to continue using Camp Arawak. She feels that it "holds the historical value of our heritage." Trial Tr. 11/02/99, p. 170. As such, she values it highly and sees it as something significant to present to the people of the Virgin Islands, those now, and still to come.

Plaintiff Roy Joseph resides in Sally's Fancy near the Great Salt Pond. He has used Great Pond bay for fishing. If the rocket facility is built as planned, his view of the bay and nearby Mount Fancy would be

70

obstructed. He has camped at Camp Arawak over the years. Joseph would like to use it if preserved as a park, and to have his grandchildren use it. He feels it would help keep youths off the street.

Plaintiff Jessica Moolenaar has fished at the bay. She would like to use Camp Arawak whenever she wants to and believes that the children need it.

Plaintiff Rowe holds great pride and respect for Virgin Islands history. She has traced her roots to Ghana, West Africa. She maintains that Camp Arawak was intended to be donated to the people in perpetuity and that the deed is not negotiable.

### 4) Execution, Ratification, and Attempted Assignment of Exchange Agreement

On December 30, 1998, former Governor Roy L. Schneider, on behalf of the Government of the Virgin Islands, executed an agreement with Beal Aerospace Technologies, Inc. (Beal) to exchange Camp Arawak (14.5 acres) for Plot No. 12 Estate Grange Hill (5 acres) and 29 adjacent plots (totaling 9.3 acres) in Estate Whim. App. pp. 6-10. The agreement recites that Beal has options to purchase the exchange properties, and had selected a 280-acre site on the south side of St. Croix upon which to build its world headquarters and a commercial rocket manufacturing factory. The options, though, were never held by Beal. They were held initially by Edwin Sedacca and assigned to intervenor Caribbean Space Technologies, LLC (CST) in early 1999. The options provide for unlimited one-month renewals, which could be refused by the property owners.

The Agreement also recites that Frank Wiesner, in 1974, "conveyed [Camp Arawak] to the Government for use as a public beach, park and other recreational facilities," and that Camp Arawak, the sole occupant, must relocate in order to maintain federal funding. App. p. 6. The contracting parties agreed that:

1) the Whim properties could be used for a public beach, park and recreational facilities;

2) the Grange Hill property would be a suitable site for Camp Arawak; and

3) the exchange would be mutually beneficial and equitable.

*Id.* The agreement was conditioned on approval by the Legislature and could not be assigned by any party except by written consent of the other.

In July 1999, defendant Governor transmitted Bill No. 23-0098 to the President of the Legislature, who introduced it on July 7, 1999. The original version of the bill provided for ratification of an exchange agreement between the Government and Beal. On October 5, 1999, the Legislature met to consider ratifying the bill. Counsel for CST met with a few senators to draft an amendment to the bill. She explained that CST would be the entity to purchase the exchange properties and take title to Camp Arawak. She also stated that she communicated with the Governor's office and no objection was raised to substituting CST for Beal. Later that day, the Legislature approved the amendment and passed the bill. It was subsequently submitted to the Governor for approval.

On October 6, 1999, plaintiff Hansen wrote to defendant Attorney General explaining that Camp Arawak, the corpus of a trust, was threatened by the Exchange Agreement and by its recent legislative ratification. She requested that he act, on behalf of its beneficiaries, to protect the trust by filing a court action for equitable relief. The next day, October 7th, Hansen and others filed this lawsuit. The Attorney General responded by letter dated October 8, 1999, stating that "the Attorney General cannot take any action involving the Wiesner Trust, in as much as, he is the attorney for the trustee." Plaintiffs' Ex. 38. He further indicated that he is disabled from enforcing the trust due to a conflict of interest.

On or about October 13, 1999, CST prepared a document (The Assignment) to assign Beal's rights under the Exchange Agreement to CST. The document is dated October 15, 1999 and was signed by Beal and CST. The Assignment, by its terms, is conditioned on consent by the Government. However, neither the Governor, nor anyone on behalf of the Government, has signed it.

### 5) Executive Approval of Bill No. 23-0098

On October 14, 1999, the enrolled version of Bill No. 23-0098, passed by the Legislature on October 5, 1999, was forwarded to the Governor. On October 26, 1999, the last day for executive approval, the Governor submitted correspondence to the Legislature stating, "I have decided to allow Bill No. 23-0098 'To ratify and approve an Exchange Agreement between the Government of the Virgin Islands and Caribbean Space Technologies, LLC and for other purposes' to become law without my signature." CST's Ex. 2.

72

## 6) Proposed Change in Use of Camp Arawak

Beal Aerospace Technologies, Inc. (Beal), the company who entered into the Exchange Agreement with the Government, is a Texas-based research and development corporation wholly owned by Andrew Beal. He also owns 99 percent of CST, a limited liability company. CST owns 100 percent of Beal Aerospace Technologies, LLC (Beal LLC), also a limited liability company. Both CST and Beal LLC were established pursuant to Virgin Islands law in mid-1998.

CST and Beal LLC (Beal Entities) plan to construct Beal's world headquarters and a commercial rocket factory at Great Pond. In order to accomplish this, they intend to purchase approximately 270 acres of land. These properties consist of: 1) Plot Nos. 5 and 6 Great Pond (Camp Arawak); 2) Plot No. 6A Great Pond (.33 acres already purchased by CST for $75,000.00); and 3) Plot Nos. 24 thru 29 Estate Great Pond (currently under purchase option for approximately $3 million). About 60,000 square feet of the facility will rest on Plot No. 6, and a parking lot road will cover about 22,000 square feet of Plot No. 5. The Beal Entities will construct the major portion of the facility on Plot Nos. 26 and 28, which totals 45.2 acres. It will have a maximum height of 100 feet with a tower reaching a maximum height of 200 feet. Plot Nos. 24, 25, 27, 29, totaling approximately 210 acres, plus a portion of Camp Arawak, will serve as a buffer. The Entities plan to assemble rockets in St. Croix and transport them on shallow-draft barges, approximately 270 feet long and 60 feet wide through Great Pond Bay for launching elsewhere.

On September 28, 1999 defendant Governor approved certain Industrial Development Commission (IDC) benefits for the Beal Entities. These benefits include 100 percent exemption from real property, gross receipts, excise, taxes. and 90 percent from income taxes for a ten-year period. To obtain these benefits, the Beal Entities are required to, among other things: invest a minimum of $57 million in their business within three years of commencement; hire, by the third year of operation, a minimum of 145 persons 80 percent of whom must be Virgin Islands residents for at least one year; contribute $30,000.00 annually to Virgin Islands students for studies germane to the Entities' operation; contribute $10,000.00 annually to the St. Croix Vocational School; and donate $10,000.00 annually to tax exempt organizations on St. Croix before commencement of manufacturing operations, and $15,000.00 annually thereafter.

Although not obligated by the IDC requirements, the Exchange Agreement, or Act 23-0098, the Beal Entities have committed to stabilizing the historic buildings at Camp Arawak, preserving the artifacts, and beautifying the area. They intend to work with the St. Croix Landmark Society to preserve the pre-Columbian artifacts and historic structures, attempt to discover new artifacts, and to restore the property. The site will be available to the public for tours.

There have been a number of rocket launch failures by other rocket manufacturers. Neither the Beal Entities, nor Beal (Texas Corporation) has manufactured a completed rocket. They have no existing contracts with satellite manufacturers. Nevertheless, the Entities maintain that they will boost St. Croix's lagging economy. To do so, they need Camp Arawak primarily as a natural buffer and to beautify the area. They have explored other areas besides Great Pond and found them unacceptable. Further, due to physical limitations of the other 255 acres, the Entities conclude that the facility cannot be redesigned so as not to rest on Camp Arawak. Consequently, they say that if they do not get Camp Arawak, they will not come to St. Croix.

## LEGAL ANALYSIS

Defendants (the Government) and Intervenor (CST) claim that Plaintiffs lack standing. This issue is the first item addressed below.

■ Plaintiffs' request is one for injunctive relief. The Government and CST assert that Plaintiffs' request is premature as they have failed to pursue and exhaust administrative remedies through the Coastal Zone Management (CZM) process. It is correct that the extraordinary remedy of an injunction is not granted where an adequate remedy at law exists. *Limar Enterprises v. Government of the Virgin Islands*, 34 V.I. 50, 53 (Terr. Ct. 1996). However, there is no administrative process by which one can appeal actions of a trustee alleged to be illegal. By the time this matter reaches the CZM Commission, title would have been transferred from the Government. Contrary to the assertions of CST, the CZM process is incompetent to return title of Camp Arawak to the people, or to force the alleged Trustee-Governor to maintain it as a park and recreation site. The recourse for alleged failure of trustees to perform their duties is to maintain an action in court for enforcement and/or injunctive relief. RESTATEMENT (SECOND) OF TRUSTS § 392 cmt. a. Thus, Plaintiffs have

no other adequate remedy of law, and are not before this Court prematurely.

■ Plaintiffs' request for injunctive relief is addressed to the sound discretion of this Court. *Schindel v. Pelican Beach Inc.*, 16 V.I. 237, 257 (Terr. Ct. 1979). Such a remedy is rare. The party, against whom it is sought here, is a co-equal branch of government. As such, this Court proceeds with the utmost of caution so as not to violate the principle of separation of powers. The request for injunction requires consideration of four factors: meritoriousness of plaintiffs' claim, harm to plaintiffs if relief is denied, relative harm to the Government and CST if relief is granted, and impact upon the public interest. *Joseph v. Henry*, 958 F. Supp. 238, 243, 36 V.I. 115 (D.V.I. App. Div. 1997). The merits are addressed in Item "2", and the other factors under Item "3" below.

Plaintiffs also request the Court to consider the appointment of a new trustee. That matter is addressed in Item "4".

### 1) Standing of Trust Beneficiaries to Sue

The Government and CST assert that pursuant to the Restatement of Trusts, Plaintiffs, as mere beneficiaries, have no standing to sue for enforcement of a charitable trust. Plaintiffs respond that Senator Hansen has standing as a co-trustee and public officer, and that they all have standing as taxpayers. For reasons which follow, this Court concludes that Plaintiffs may sue as beneficiaries and taxpayers under the special circumstances of the Camp Arawak Trust.

■ The relevant statute provides:[2]

> A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or by a co-trustee, or by a person who has a special interest in the enforcement of the charitable trust, but not by persons who have no special interest or by the settlor or his heirs, personal representatives or next of kin.

RESTATEMENT (SECOND) OF TRUSTS, § 391 (1959). This section prohibits suits by mere members of the public who may benefit from enforcement of

---

[2] The Virgin Islands has not enacted any law which specifically governs *charitable* trusts. Consequently, this Court looks to the RESTATEMENT (SECOND) OF TRUSTS: Charitable Trusts for the rule of decision on all of the trust related issues subjudice. 1 V.I.C. § 4.

the trust. *Id.*, cmt. d. Thus, beneficiaries with no special interests are precluded from burdening trustees and flooding the courts with multiple enforcement actions. *See* George Bogert on *Trusts & Trustees*, § 414 p. 39 (2d. 1991). The underlying rationale is that the Attorney General, as representative of the community, can maintain a suit on behalf of the general public. REST. § 391 cmt. d. The rationale, though, is pointless if the attorney general is disabled from maintaining a suit on behalf of the public. Under a strict interpretation of § 391, a charitable trust would be unprotected if the trustee were to act contrary to the trust's interest, and the Attorney General were disabled or fails to represent the trust.

■ The Supreme Court of Hawaii faced such a circumstance in *Kapiolani Park Preservation Society v. Honolulu*, 69 Haw. 569, 751 P.2d 1022 (1988). There, members of the public filed suit against the Trustee-City to enforce a charitable trust. They sought to halt implementation of an agreement between the city and a private corporation to lease a portion of Kapiolani Park to erect a restaurant. The Trustee-City did not seek instructions from the court as to its duties though there was a genuine controversy as to the legality of the agreement. Further, the Attorney General supported the agreement. Holding that under those circumstances, members of the public had standing to sue, the court said:

> Were we to hold otherwise, the City, with the concurrence of the attorney general, would be free to dispose, by lease or deed, of all, or parts of, the trust comprising Kapiolani Park, as it chose, without the citizens of the City and State having any recourse to the courts. Such a result is contrary to all principles of equity and shocking to the conscience of the court.

751 P.2d at 1025. The Hawaii Court's holding is well-reasoned. A charitable trust ought not suffer extinction, without opportunity for judicial appeal by its beneficiaries, simply because the attorney general is disabled from suing on their behalf. The more rational and equitable approach, under such circumstances, is to permit direct access to the courts by the beneficiaries themselves, *compare, In re Trust Created by Hill*, 509 N.W.2d 168, 172 (Minn. Ct. App. 1993) (holding former trustee/descendant of settlor had standing to sue where attorney general failed to represent charitable trust). Accordingly, this Court now declares, pursuant to fundamental fairness, that any public officer, or any number of beneficiaries of a charitable trust, may maintain a

representative action for enforcement, on behalf of all beneficiaries present and prospective, where: 1) the Attorney General is disabled from representing the beneficiaries or fails to do so; and 2) a genuine question exists as to the legality of proposed action by the trustee.[3]

Here, Plaintiffs challenge the actions of alleged Trustee-Governor. The Trustee-Governor proposes to trade away property contrary to the terms of the alleged trust and to permit its non-public use. Legal counsel for the Legislature, Yvonne L. Tharpes, advised the Legislature of the illegality of the proposed transfer and recommended that it withhold action until the Trustee-Governor sought instructions from the court. Motion for Temporary Restraining Order, Unnumbered Exhibit. She also noted that the Attorney General acknowledged that the proposed transfer sparked controversial legal issues. Indeed, counsel for Beal Aerospace Technologies, Inc. submitted a memorandum to the Legislature concluding that the transfer was legal. Opposition to [CST's] Motion to Intervene, Unnumbered Exhibit. There thus was an apparent genuine issue as to the legality of the proposed action. The Attorney General declared his disability to file suit due to a conflict of interest. In light of these specific circumstances, Plaintiff Hansen as a public officer, and all Plaintiffs, as beneficiaries to a charitable trust, have standing to maintain this action for enforcement.

Plaintiffs also claim that they have standing under the Taxpayers' Suits Statute. The Government and CST respond that the statute is not applicable to a sovereign territorial government where no special injury is shown. This Court concurs with Plaintiffs.

■ The applicable statute provides that:

a taxpayer may maintain an action to restrain illegal or unauthorized acts by a territorial officer or employee, or the wrongful disbursement of territorial funds.

5 V.I.C. § 80. The purpose of this statute is to enable taxpayers to seek aid of the courts "to restrain any illegal acts of territorial authorities . . . or the

---

[3] This holding is in keeping with the trend of recent cases to "change from the more traditional approach by permitting persons deemed to represent a class of actual or prospective beneficiaries to bring suit to enforce on behalf of a charitable trust." Bogert § 414 pp. 47-51.

unlawful alienation of territorial property." *Smith v. Government of the Virgin Islands*, 329 F.2d 131, 133, 4 V.I. 489 (3d Cir. 1964) (emphasis added). It serves "a very useful public purpose in keeping within legal bounds the actions of government officers, especially in dealing with public property and funds." *Id.* The statute imposes no requirement to show special damage. *Id.* at 134. Further, the minuteness of a plaintiff's interest is not a basis to deny standing. *Id.* A plaintiff need merely show that they are territorial taxpayers. *Id.* at 133 (holding that territorial taxpayers had standing to sue V.I. Government and Commissioner for alleged illegal conveyance of government property to private individual).

██ ██ Here, Plaintiffs assert that a territorial officer, the Governor, committed illegal acts by contracting to alienate territorial property (Camp Arawak) contrary to trust law, and by submitting the contract (the Exchange Agreement) to the Legislature for ratification. Plaintiffs Hansen and Rowe are gainfully employed by the Virgin Islands Legislature. Plaintiff Joseph is self-employed, and plaintiff Nico is retired. This Court infers from this that these plaintiffs are taxpayers. Their claim thus falls squarely within the statute. *See Holmes v. Government of the Virgin Islands*, 370 F. Supp. 715, 10 V.I. 365, 370 (D.V.I. 1974) (holding taxpayers had standing to sue Government seeking declaration that legislative act, which ratified agreement between Government and private company to build oil refinery on St. Croix, was invalid). Accordingly, Plaintiffs have standing to maintain this action pursuant to 5 V.I.C. § 80. *See Petition of Village of Mount Prospect*, 167 Ill. App. 3d 1031, 522 N.E.2d 122, 127 (1988) (stating that taxpayers, in particular, have standing to enforce a trust upon which public property is held).

## 2) Merits

### A) *Creation and Breach of Charitable Trust*

Plaintiffs' predominant claim is that: 1) a charitable trust was created by the 1974 conveyance of Camp Arawak to the Government; and 2) the Trustee-Governor first breached the trust when he executed the Exchange Agreement on December 30, 1998 in an attempt to trade away Camp Arawak, and again when he submitted it for ratification and approval to

the Legislature in July 1999.[4] The Government and CST reply that: 1) no charitable trust was created by the conveyance; 2) Act 23-0098, the applicable law, authorizes the transfer notwithstanding contrary local laws; and 3) the transfer should be judicially approved pursuant to the doctrines of *cy pres* or equitable deviation.[5] The defense of Act 23-0098 is addressed in Section "B", and that of *cy pres* and equitable deviation in Section "C" below.

■ Resolution of the breach of trust issue requires a preliminary determination of whether a charitable trust exists. A charitable trust is

> a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.

RESTATEMENT (SECOND) OF TRUSTS § 348. A fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another." BLACK'S LAW DICTIONARY p. 626 (6th ed. 1990). To be charitable, a trust must be "designed to accomplish objects which are beneficial to the community." REST. § 368 cmt. a. The trustee holds legal title in trust for the benefit of the community. *Petition of Village of Mount Prospect*, 167 Ill. App. 3d 1031, 522 N.E.2d 122, 125 (1988); *In Re Eggan's Estate*, 86 Idaho 328, 386 P.2d 563, 568 (1963). Both the beneficiaries, and the duration of a charitable trust, may be indefinite. REST. §§ 364, 365. Thus charitable trusts may endure forever. *Id.*, § 365 cmt. a.

---

[4] Plaintiffs, in Count 2, further claim that the exchange would violate restrictive covenants applicable to Camp Arawak. Since this Court determines the legality of the exchange on other grounds, it does not decide Plaintiffs' restrictive covenants claim.

Considerable evidence and argument focused on the Contract Clause issue raised by Plaintiffs. That issue would have required this Court to consider the wisdom and reasonableness of the Legislature in passing Bill No. 23-0098. As explained, *infra*, this Court resolves Plaintiffs' predominant claim without reaching federal issues. Consequently, it does not judge legislative wisdom or reasonableness in passing Bill 23-0098, the alleged economic benefits of the exchange, or even whether Beal should come to St. Croix. Instead, this opinion focuses on whether, under the circumstances, the Government may legally trade away Camp Arawak.

[5] The Government and CST raised many other issues relative to the merits of Plaintiffs' claim. This Court finds them without merit and unworthy of specific mention.

■ The essential elements of a charitable trust, then, are:

1) the existence of a fiduciary (i.e., trust or confidential) relationship concerning property;
2) an intention to create such a relationship;
3) the imposition of equitable duties to deal with the property for a charitable purpose (i.e., one beneficial to the community); and
4) the separation of legal from beneficial interests.

■ Charitable trusts are created, among other methods, by "a transfer inter vivos by the owner of property to another to hold it upon a charitable trust." *Id.*, § 349(b). The intention to create a charitable trust must be properly manifested. *Id.*, § 351. No particular words or conduct is required. *Id.*, § 351 cmt. b. The settlor (i.e., creator of the trust) need not even use the words "trust" or "trustee." *Id.* However, the words chosen must manifest an intention to impose enforceable duties, and not merely express a wish or suggestion that the transferee use the property for charitable purposes. *Id.*, § 351 cmt. c. Further, the use of precatory language does not necessarily disprove an intention to create a charitable trust. *Id.* Intent is determined by viewing the trust instrument as a whole in light of the circumstances attending its execution. *Gredig v. Sterling*, 47 F.2d 832, 834 (5th Cir. 1931); *Cohen v. City of Lynn*, 33 Mass. App. Ct. 271, 598 N.E.2d 682, 684 (1992). Cognizant of these rules, the Court determines whether Camp Arawak is the subject of a charitable trust.

The language of the 1974 deed of conveyance unequivocally recites Wiesner's intent to create a charitable trust. It states in part:

■ NOW THEREFORE,

... **in consideration of the foregoing**, and in observation of the covenants of exclusive recreational use for the people of the Virgin Islands ... [Grantor] grants and conveys unto the Government ... all right, title and interest in [Camp Arawak].

App. p. 1 (emphasis supplied). It is obvious that Wiesner considered the recitals, preceding the "NOW THEREFORE" clause, in making the conveyance. Those foregoing recitals, in part, are that:

... it is the desire of the Grantor ... for the benefit of all the people ... that they ... shall have a parcel of land on the south shore of St. Croix for public beach, park and other recreational facilities ... and

80

... it is Grantor's further desire that the people ... shall enjoy the benefits of this land and the historical structures located thereon in perpetuity ...

WHEREAS, the Governor and the legislature ... acting on behalf of the people ... accept this gift in trust for them, knowing that it is being given to the people in perpetuity for the express and direct purpose of beach, park, and other public recreational use.

*Id.* It is thus very apparent that Wiesner specifically intended to create a trust relationship with the Government whereby it would: 1) accept property (Camp Arawak) on behalf of the people of the Virgin Islands; and 2) promise to maintain it, and the historic structures upon it, as a beach, park and recreational facility for enjoyment by the people. Accordingly, the conveyance of Camp Arawak to the Government on December 17, 1974 for perpetual use by the people as a beach, park and recreational facility, created a charitable trust, and the Government holds equitable title for the people. REST. § 373; *Cohen*, 598 N.E.2d at 685 (stating "conveyance of land for parks in perpetuity establishes a public charitable trust").[6]

Having concluded that Camp Arawak is the subject of a charitable trust, this Court now determines whether it was within the power of the Trustee-Governor to attempt to: 1) convert Camp Arawak to non-public use; and 2) exchange its title for substitute property.

---

[6] The Government and CST argue that the Government never accepted Wiesner's deed nor promised to act as fiduciary with respect to Camp Arawak. This argument is untenable, disingenuous, and distasteful. The evidence reveals that Wiesner communicated with a government agent, i.e., then-Deputy Commissioner Valmy Thomas, prior to conveyance. He reviewed, and approved, a recreational plan developed by Thomas. Then-Governor Melvin Evans instructed then-Commissioner Hortense Rowe, after being told of Wiesner's plans, to prepare the legal documents for acceptance. The deed recites that the Governor and Legislature accepted the property knowing of its use limitations. Then, the Recorder of Deeds, a government agency, accepted the deed for recording at 2:20 p.m. on December 27, 1974. Thereafter, the Government utilized the property, in part, for recreational use through Arawak Program, Inc. Finally, the very Attorney General, defendant Iver A. Stridiron, in his October 8, 1999 response letter to Senator Hansen stated, "... **since the Government is the trustee of the Wiesner Trust** ... the Attorney General is disabled from enforcing the Trust against the Government". Plaintiff's Ex. 38 (emphasis added). Under these circumstances, the Government will not be heard to deny its fiduciary duties. *See* REST. § 354 cmt. a (providing that charitable trust may be created without acceptance by trustee, and that trustee may not disclaim duties unless he has not manifested his consent to act as trustee).

 Trustees are subject to certain duties to administer their trusts. In part, they are required to:

1) administer the trust solely in the interest of effectuating the charitable purposes;
2) take reasonable steps to take and keep control of the trust property; and
3) use reasonable care and skill to preserve the trust property.

REST. § 379 cmt. a. Trustees are held to a strict standard of loyalty. They must not be influenced by third party interests when dealing with trust beneficiaries. REST. § 170 cmt. p. Their loyalty stands at a unique level. As one court puts it:

'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. (Citations omitted) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.'

*Connecticut Bank and Trust Co. v. Hartford Hospital*, 29 Conn. Supp. 158, 276 A.2d 792, 796-797 (1971) citing *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 * * *.

 The powers of a trustee are those specifically conferred by the terms of the trust and those necessary or appropriate to carry out trust purposes. REST. § 380. The Camp Arawak Trust contains no authority to exchange or otherwise dispose of trust property, or to convert it to non-public use. The Exchange Agreement proposes to transfer title to Camp Arawak to a private entity to construct a private rocket manufacturing facility. This proposed use is inconsistent with the trust purposes of a beach, park and recreational facility. Thus, by executing the Agreement, and submitting it to the Legislature for ratification, the Trustee-Governor: 1) exercised a power not conferred by the trust's terms and which was not necessary or appropriate to accomplish trust purposes. Such actions were a breach of his duty to: 1) to administer the trust solely

82

in the interest of its charitable purposes; and 2) to keep control of, and preserve, the trust property. *City of Reno v. Goldwater*, 92 Nev. 698, 558 P.2d 532, 533 (1976) (holding that City breached charitable trust when it traded trust property to private persons for a nonpublic use).

## B) *Relevancy of Act No. 23-0098*

In defense to Plaintiffs' trust law claim, the Government and CST assert that the proposed transfer of Camp Arawak is legal because Act No. 23-0098 (the Act) authorizes it, "notwithstanding any other provision of Virgin Islands law to the contrary including all common law, statutory and equitable principles." In substance, they assert that the Act is the most recent pronouncement of the Legislature, and specifically modifies the general trust law relied upon by Plaintiffs. Therefore, their argument concludes, the transfer is legal pursuant to current Virgin Islands law. Plaintiffs reply that the Act is violative of the Contract and Equal Protection Clauses.[7] This Court finds Act 23-0098 irrelevant to this proceeding, as it is incapable of application.

The assertions of the Government and CST are partially correct. The Twenty-Third Legislature is not bound by the acts of its predecessors. It is free to "amend, alter, modify, or repeal any local law" so long as the new law is not inconsistent with any federal law. 1954 Revised Organic Act, § 8(c). Act No. 23-0098 is indeed the latest law appearing to bear some connection to the transfer of Camp Arawak. However, it is relevant to this proceeding only if it authorizes the transfer that would otherwise be illegal under general trust law. So then, this Court construes the Act in attempt to apply it.

---

[7] CST asserts that Plaintiffs waived their right to raise federal issues in defense of the Act since they amended their complaint to delete all federal claims. It thus re-moves this Court to grant it judgment as a matter of law. CST's argument is legally untenable for two reasons.

First, both the Government and CST raised Act 23-0098 as an affirmative defense in answer to Plaintiffs' complaint. Government's Answer, pp. 6-7, paras. 2 and 6, CST's Answer, p. 5, para. 5. No responsive pleading is required to an answer unless it contains a counterclaim or cross-claim. FED. R. CIV. P. 7(a). None was included in the Government's nor CST's Answer. Thus Plaintiffs are free to assert at trial any defense in law or fact to the raising of the Act by the Government and CST. FED. R. CIV. P. 12(b).

Second, even if a response was required, and should now be considered waived, the issue is moot since this Court's decision is independent of federal law. Accordingly, the motion for judgment as a matter of law is denied.

■ Construction of a statute necessarily begins with an examination of the statutory language and design, and a presumption that the Legislature's intent is manifested through the ordinary meaning of the words chosen. *Walters v. Metropolitan Educational Enterprises*, 519 U.S. 202, 117 S. Ct. 660, 664, 136 L. Ed. 2d 644 (1997); *accord Crandon v. United States*, 494 U.S. 152, 110 S. Ct. 997, 1001, 108 L. Ed. 2d 132 (1990); *accord Government of the Virgin Islands v. Knight*, 989 F.2d 619, 633, 28 V.I. 249 (3d Cir. 1993). The Court, considering the statute as a whole, decides whether the language is plain and unambiguous with respect to the relevant dispute. *Robinson v. Shell Oil*, 519 U.S. 337, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997). If it is, the inquiry is ended. *Id.* If not, an analysis of the legislative history is appropriate. *Smith v. Magras*, 124 F.3d 457, 465, 37 V.I. 464 (3d Cir. 1997). Here, the rule of decision, absent the Act, is to be found in common law. The Act begins with a "notwithstanding" proviso evincing a purpose to derogate common law. As such, it is subject to strict scrutiny. 2 *Sutherland Statutory Construction* § 61.01 (5th ed. 1992). With these principles in mind, the Court proceeds to construe the Act.

An examination of the language and design of Act No. 23-0098 reveals that it is intended to ratify and approve an agreement between the Government and CST. This is evident from the stated purpose of the bill: "to ratify and approve an Exchange Agreement between the Government of the Virgin Islands and Caribbean Space Technologies, LLC." CST Ex. 1. Consistent with this purpose, SECTION 1 provides in pertinent part:

> . . . the Legislature hereby ratifies and approves the Agreement entitled "Exchange Agreement", **between the Government of the Virgin Islands and Caribbean Space Technologies, LLC**, dated December 30, 1998, which is attached hereto as Appendix A, and by this reference made a part hereof.

*Id.* (emphasis supplied). By virtue of the language "made a part hereof" in SECTION 1, the "Exchange Agreement" in Appendix A is part of the law (i.e., Act 23-0098). It must be considered in construing the Act as a whole. In pertinent part, the "Exchange Agreement" provides:

> THIS EXCHANGE AGREEMENT . . . is made and entered into this *30th* day of *December*, 1998, by and **between the GOVERNMENT OF THE VIRGIN ISLANDS (Government) and Beal Aerospace Technologies, Inc. ("Beal")**.

84

Plaintiffs' Ex. 2, p. 1 (emphasis supplied). No where in the Exchange Agreement do the names "Caribbean Space Technologies, LLC" or "CST" appear. Although each is effectively owned 100 percent by the same person, Beal and CST are two separate entities.[8] Thus, the absence of any reference to CST in the Exchange Agreement appears to create doubt as to which agreement the Legislature is ratifying, one between the Government and CST, or one between the Government and Beal. The doubt is rectified, however, by analysis of the legislative history and circumstances attendant to passage of Bill No. 23-0098.

The original version of the bill provided that its purpose was to ratify an agreement between the Government and Beal. On October 5, 1999, prior to passage of the bill, counsel for CST requested certain senators to amend the bill to substitute CST for Beal since CST would be the entity to receive title to Camp Arawak. She also told them that the Governor had agreed to the change. The senators made the amendment and it was subsequently passed. Thus it is clear that the Legislature intended to ratify and approve an agreement between the *Government* and *CST*.

That does not end the inquiry. The intent of the bill presupposes the existence of an agreement between the Government and CST. But no such creature existed on October 5, 1999 when Bill 23-0098 was passed. Beal's rights under the Exchange Agreement were never assigned to CST. The document which purports to do so was not even prepared until October 13th or 14th 1999. Further, Section 9 of the Exchange Agreement requires written consent of both parties to effect a valid assignment. Beal and CST have executed the assignment. The Governor has not. Thus, there was no agreement between the Government and CST which could have been ratified on October 5, 1999, and none was presented to this Court by the close of evidence on November 15, 1999. The Act, therefore, attempts to ratify and approve a non-existent agreement. It is internally inconsistent. Under these circumstances, the intent of the Legislature is

---

[8] This difference in name is no insignificant clerical oversight. Beal is a corporation. It is axiomatic that a corporation assumes an existence separate and apart from its owners and/or managers. 13 V.I.C. § 6. Similarly, CST is a limited liability company, distinct from its members. 13 V.I.C. § 1201. This is not a case where one company owns part, or is a parent, of another. Their commonality of ownership does not create a merger. Generally, Beal cannot be held liable for acts of CST, nor visa versa. Thus a mere name change between these two entities triggers significant legal ramifications. Here, it is critical to the vitality of the Act.

legally impossible to implement.[9] Accordingly, Act 23-0098 does not authorize the transfer of Camp Arawak to anyone and is thus irrelevant to the facts of this case.[10]

⬛⬛⬛⬛ This conclusion should not be construed to sanction legislative power to terminate a charitable trust or alter its terms. Even if the Act authorized a transfer of Camp Arawak, pursuant to the Exchange Agreement, it would violate the Doctrine of Separation of Powers. That doctrine is alive and well in the Virgin Islands. *Smith v. Magras*, 124 F.3d 457, 465, 37 V.I. 464 (3d Cir. 1997). It is a fundamental principle of the American constitutional system which separates the duties of each co-equal branch of government.

> To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary, the duty of interpreting and applying them in cases properly before the courts.

*Massachusetts v. Mellon*, 262 U.S. 447, 43 S. Ct. 597, 601, 67 L. Ed. 1078 (1922). Generally, one branch may not invade the province of the other. *Id.*

⬛⬛⬛⬛ A cursory analysis of the first page of the Exchange Agreement immediately reveals that the parties to it: 1) were aware that certain use restrictions attached to Camp Arawak; 2) concluded that the required use could be exercised on substitute property; and 3) decided to change the use of Camp Arawak from public to private use. This is a clear attempt by the executive branch to remodel the Camp Arawak Trust or deviate from its terms. In fact, the Government asserted in its answer, that the Exchange Agreement "constitutes a valid application of the doctrine of *cy*

---

[9] Defendant Governor recognized this flaw and pointed it out in his October 26, 1999 letter to the president of the Legislature. He said, "My original legislation would have ratified an agreement between the Government and [Beal]. However, the bill was amended on the floor to change the name to [CST]. There needs to be conformity in the name of the entity in both the Act and the Exchange Agreement." CST Ex. 2.

[10] SECTION 3 similarly does not authorize the transfer. It provides that: "The Governor is hereby authorized to negotiate, execute and enter into any subsequent agreement necessary to effectuate the transfer of the property as stated herein between the Government . . . and [CST]." This purported authorization speaks to subsequent agreements to effectuate "the transfer of the property as stated [in SECTION 1]." As previously explained, SECTION 1 addresses a non-existent agreement between the Government and CST. Thus, there is no "transfer" which can be effectuated by subsequent agreements. Accordingly, SECTION 3 is likewise incapable of execution and does not authorize the transfer of Camp Arawak.

*pres* or equitable deviation." Defendants' Answer, p. 7, para. 5. By ratifying such an agreement, the Legislature would be assuming the function of interpreting and applying law (i.e., the doctrines of *cy pres* and equitable deviation). This it cannot do. *Opinion of the Justices to the House, Etc.*, 374 Mass. 843, 371 N.E.2d 1349, 1355 (1978) (stating that "application of the doctrine of *cy pres* to alter charitable trusts is performed by the courts"); *accord Petition of Village of Mount Prospect*, 522 N.E.2d at 125-126 (stating that "the court, not the trustee, decides whether to apply the *cy pres* doctrine to a particular trust").

 It is the inherent duty and province of the courts to interpret and apply law. *Mellon*, 43 S. Ct. at 601. With respect to charitable trusts in particular, the courts hold the power of general administration. REST. § 399 cmt. p; *accord City of Hartford v. Larrabee Fund Assoc.*, 161 Conn. 312, 288 A.2d 71, 74 (1971) (stating that courts have exclusive jurisdiction over administration of charitable trusts); *accord Opinion of the Justices*, 101 N.H. 531, 133 A.2d 792, 794 (1957) (stating it is well established that "the administration of charitable trusts falls with in the jurisdiction of courts of equity, which have unquestioned authority in appropriate circumstances to permit departure from the literal terms of such a trust by exercise of the power of *cy pres*"). Both the *cy pres* and equitable deviation doctrines contemplate the continued existence, albeit modified, of the trust. The effect of the Exchange Agreement here, however, is to terminate the trust![11] Although the Legislature may enact general rules concerning the extent and exercise of the court's administrative power,

> [i]t is not within the power of the Legislature to terminate a charitable trust, to change its administration upon grounds of expediency, or to seek to control its disposition under the doctrine of *cy pres*. * * * Determination of the uses to which shall be devoted trusts no longer susceptible of execution according to their foundation is a well recognized branch of chancery jurisdiction * * * respecting which there is constant resort to the judicial courts for decision.

---

[11] Nothing in the Act or Exchange Agreement requires maintenance of the substitute properties as a beach, park or recreational facility. Both however, *attempt* to alter the use of Camp Arawak from public to private. Thus, the Agreement effectively sounds the death knoll of the Camp Arawak Trust.

87

*Id.* citing *Opinion of the Justices to the Senate*, 237 Mass. 613, 131 N.E. 31, 32 (1921); *accord Opinion of the Justices to the House, Etc.*, 374 Mass. 843, 371 N.E. 2d 1349, 1355; *See Mount Prospect*, 522 N.E.2d at 125-126 (stating that "not even the legislature can authorize the municipality to alienate its interest," and that courts have original and inherent jurisdiction to respond to trustee's request for guidance concerning trustee's powers and duties). *See also Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue*, 324 F.2d 633, 644 (8th Cir. 1963) (stating "it has been held that the legislature has no power to destroy or to vary the terms of a valid charitable trust"). Accordingly, any action by the Legislative branch to terminate a charitable trust, or alter its terms, is an unjustifiable assumption of a function more properly entrusted to the judiciary, and thus violative of the Doctrine of Separation of Powers. *Compare United States v. Frank*, 864 F.2d 992, 1013 (3d Cir. 1988) (explaining that functional violation of separation of powers exists where one governmental branch unjustifiably assumes a function more appropriately entrusted to another).

### C) *Doctrines of Cy Pres and Equitable Deviation*

The Government and CST assert that even if the proposed exchange would constitute a breach of trust terms, this Court should nevertheless approve it pursuant to the doctrines of *cy pres* and equitable deviation. Plaintiff responds that both doctrines are inapplicable since Camp Arawak can be used as a park and other trustees can maintain it as such. This Court finds both doctrines inapplicable under the facts of this case.

The doctrine of *cy pres* is a rule of construction used by courts to effectuate charitable gifts where it is impossible, impracticable, or illegal to carry out the specific intent of the donor. The court attempts to put the gift to its next closest use to the donor's intent. REST. § 399, cmt. a; *In re Matzo Food Products*, 156 F.R.D. 600, 605 (D.N.J. 1994). It is a device to save a trust from failure. REST. § 399. Pursuant to the doctrine, a court will direct the application of charitable trust property to a purpose different to the specific intention of the settlor, but still within her/his general charitable intention. REST. § 399 cmt. a. This is permissible where: 1) the *particular* purpose of the trust becomes impossible, impractical, or illegal to carry out; and 2) the settlor manifested a more *general* charitable intention.

*Cy pres* however, cannot be applied by a trustee, even if it becomes impossible, impracticable, or illegal to achieve the trust's

purpose. Under those circumstances, the trustee should apply to the court for instructions. REST. § 399 cmt. e. If a trustee proceeds, without court approval, to apply *cy pres*, she or he is subject to liability for breach of trust. *Id.* However, if the application is such that a court would have approved it, the court may approve it after the fact. *Id.* This, then, is the request of the Government and CST.

■ In this case, Wiesner had no "general" charitable intention. His intention was specific. He intended that the people of the Virgin Islands, along with its visitors, "shall have a parcel of land on the south shore of St. Croix for public beach, park and other recreational facilities." App. p. 1. The absence of a general charitable intention, alone, precludes the application of *cy pres*. Even if there were such an intention, any assertion that it is impossible, impractical, or illegal to utilize Camp Arawak as a beach, park or recreational facility, flies in the face of the evidence and common sense.

Plot No. 6 of Camp Arawak, alone, consists of ten (10) acres of flat, firm open field. Clearly, it can be used as a park and for recreational purposes. Arawak Program, Inc., Seventh-Day Adventist Pathfinders, and some Plaintiffs have used it as such for many years. Hundreds of people recreated on the site just two months ago, on October 16, 1999, albeit at the behest of Plaintiff Hansen. Indeed, the Commissioner of Conservation, Ira Hobson, testified that Camp Arawak is a park. The site certainly is not incapable of park or recreational use, nor is such use illegal.

CST claims, however, that it is impracticable for the Government to maintain Camp Arawak as a park and recreational facility because it cannot afford to do so. The issue, however, is not whether it is impracticable for the Government to maintain Camp Arawak as such, but whether it is impracticable for **any** trustee to do so. CST has made no showing that no trustee could maintain Camp Arawak as a beach, park and recreational facility. If the government is incapable of performance, the appropriate remedy would be to appoint a capable trustee since the property can physically be used as a park. *See* REST. § 387. *Cy pres* application is not the answer.

■ Under the doctrine of equitable deviation, courts permit trustees to deviate from trust terms where compliance: 1) is impossible or illegal; or 2) would defeat or substantially impair accomplishment of the trust purpose. REST. § 381. As explained above, compliance with the terms of

89

the Camp Arawak Trust is not impossible or illegal, nor would it defeat or substantially impair the trust's purpose. Accordingly, the equitable deviation doctrine is likewise inapplicable here.[12]

### 3) Irreparable Harm, Balance of Hardships, and Public Interest

Plaintiffs claim that if the Exchange Agreement is implemented, they will suffer irreparable harm. Specifically, they assert they will lose: 1) ownership to Camp Arawak; 2) the opportunity to use and enjoy it, forever, as a park or recreational facility; 3) the opportunity to cherish, forever, the historic structures which provide a link to their Ancestors; and 4) the opportunity to show and tell the youths about the archaeological, cultural and historical significance of Camp Arawak, whenever and however they wish. The Government and CST counter that: 1) there are alternate recreational and historical sites on St. Croix which Plaintiffs may enjoy; 2) Plaintiffs will still have access to the beach and shorelines of Camp Arawak; 3) the Coastal Zone Management (CZM) process would insure preservation of the historic structures and artifacts; and 4) the historic buildings will be available for tours after restoration by CST. A simple analysis of the parties' respective claims plainly reveals that this factor weighs in Plaintiffs' favor.

 The Government and CST over-trivializes the harm Plaintiffs will suffer upon implementation of the Exchange Agreement. Sixty thousand square feet of a rocket factory would be erected on the Camp. It will cease to be a public park. The government will no longer hold title for the people, and a private party (CST and/or Beal LLC) will decide if, when, and how the people may use it. CST, as the owner of private property, will bear the right to exclude Plaintiffs from Camp Arawak. The people will have to seek, hope, and maybe pay, for CST's permission to use what was once theirs. Plaintiffs would also lose the right to own artifacts known to be present on the Camp and those yet to be discovered. Further, they will lose the right to catalog and display any archaeological relics on the site. The harm is all too obvious. The Government and CST simply fail to

---

[12] Even if the circumstances warranted application of the *cy pres* or equitable deviation doctrines, this Court nonetheless would apply neither. Both doctrines are designed to save a trust from failure. The proposed transfer, as explained *infra*, would effectively terminate the trust. The transfer, then, would not be an appropriate application of *cy pres* or equitable deviation.

recognize the value of property ownership. They do not address the intangible benefits associated with property ownership, such as the increased sense of pride, well-being and security attendant to the right to choose when and how to use, maintain and cherish one's property or to prohibit its unauthorized use.

This harm is not mitigated simply because other recreational or historic sites exist. The Government argues that ownership of these other sites change with the demand of the marketplace. Many of these sites are under private ownership and thus inaccessible to Plaintiffs. Plaintiffs own Camp Awarak. It is a *trust* with unique archaeological, cultural, and historical significance. It's on a bay. It is a place where the African Ancestors of the people lived and worked. The historic structures upon it serve as tangible links to the historic past of the people. They tell a story and remind them of their ancestors' struggles, which eventually led to their freedom from bondage. This freedom is now enjoyed by the people. This special ancestral connection magnifies the harm of depriving the people of Camp Arawak. Such a harm is irreparable because it is impossible to restore past deprivation of property use. Further, monetary compensation is inadequate to remedy such a harm. *Compare Chalk v. United States District Court Central District of California*, 840 F.2d 701, 710 (9th Cir. 1988) (finding that deprivation of opportunity to teach children, a source of personal satisfaction and joy to the plaintiff, was a cognizable non-compensable psychological injury sufficient to constitute irreparable harm). Neither access to the beach and shorelines, the CZM process after loss of ownership, nor the availability of tours, lessen this harm in the least. Accordingly, this Court concludes that implementation of the Exchange Agreement will cause Plaintiffs to suffer irreparable harm.[13]

---

[13] CST claims that embarrassment and similar forms of psychic distress are not recognized grounds for establishing irreparable harm. It cites *Anderson v. Government of the Virgin Islands*, 947 F. Supp. 894, 900 n.8, 35 V.I. 314 (D.V.I. 1996) in support of its proposition. *Anderson*, however, cites and erroneously expands the conclusion in *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 659 (3d Cir. 1991). In that case, the Third Circuit stated, "we believe it unlikely that such embarrassment qualifies as irreparable injury in the case of corporate defendants." The Court's conclusion was limited to *corporate* defendants and to *one* type of psychic harm. Thus CST's broad assertion that the law in this territory does not recognize psychic distress as grounds for establishing irreparable harm is plainly wrong. Here, the claimants of irreparable injury are *actual persons*, who claim not embarrassment, but a real deprivation of the right to use property. This case is thus distinguishable.

CST claims that it will suffer harm if an injunction were to issue because: 1) competitors of the Beal Entities would get a head start in the increasingly competitive market for satellite launch capacity; and 2) the project would have to be abandoned and moved to a more hospitable location. CST's argument is speculative. There is no evidence concerning the status of CST's competitors. Moreover, CST's argument presumes that its project would be successful. CST has been in existence for a mere 18 months. There is no evidence that it ever made profits or is even conducting business. Based on the evidence, there have been a number of rocket launch failures, and CST's own counsel stated that it may not make a penny of profit. Trial Tr. pp. 227, 231. Further, CST has no rights under the Exchange Agreement, which this Court has found illegal. Thus CST's claimed harm is pure speculation.

On the other hand, Plaintiffs possessed and exercised ownership rights to Camp Arawak for 25 years. Those rights are subject to extinction absent the issuance of an injunction. On balance, Plaintiffs harm, if an injunction is denied, substantially outweighs any harm CST may suffer if one is issued.

The Government appears to argue that Plaintiffs can prevail on the public interest factor only by showing that Act 23-0098 is unconstitutional. This argument is difficult to follow. The Act has not been declared unconstitutional, but incapable of application. There is no law passed by the Legislature, relevant to this proceeding, for which it would be in the public interest to support. Thus, the Government has shown no public interest weighing against issuance of an injunction.

CST claims that the public interest favors denial of an injunction. It argues that the public will gain knowledge through the CST's exploration and cataloging of the pre-historic and historic relics. CST further says that St. Croix will benefit financially as the Beal Entities expend resources in preparation for construction and development. Such preparation, however, can only commence if CST secures the necessary approvals. If not, CST cannot build its factory, and the people would lose not only the alleged benefits, but Camp Arawak itself.[14] Therefore, the people bear the

---

[14] Pursuant to SECTION 4 of Act 23-0098, Camp Arawak reverts to the Government only if CST obtains necessary federal and territorial approvals, and then fails to construct its rocket facility. CST Ex. 1. The Act does not require reversion if the factory is not constructed due

92

greater risk of loss under the Exchange Agreement. Such risk is not in the public interest.

### 4) Appointment of New Trustee

■ As part of their requests for relief, Plaintiffs ask this Court to remove the Trustee-Governor and to appoint a new trustee. In light of the Court's general power of administration over trusts, such relief rests within the reasonable discretion of the Court. A court may remove a trustee, and appoint a new one, if continuance of the trustee in such position would be detrimental to the accomplishment of the trust's purposes. RESTATEMENT (SECOND) OF TRUSTS §§ 387, 388. Specifically, a trustee may be removed for, among other things, serious breach of the trust or lack of capacity. REST. § 387 cmt. b.

■ The facts here show that the Government has failed to maintain Camp Arawak over the years, and that the Trustee-Governor has breached the trust. However, this Court recognizes that: 1) there were legitimate disputes over the legality of the transfer; 2) Trustee-Governor, like all preceding governors, has advisors; 3) the territory is experiencing economic hardship; and 4) promising new industries are generally attractive investments. These factors lead the Court to conclude that the Governor acted in a manner he thought legal, and beneficial to the community as a whole.[15] This Court's decision now puts all on notice of the proposed transfer's illegality and puts the trustee on notice as to his duties. The Court has no reason to believe that the Trustee-Governor would knowingly violate the Camp Arawak Trust and thus, removal due to the breach is unnecessary.

Similarly, there is no basis to conclude that the Trustee-Governor is incapable of adequately administering the trust despite past neglect. The Camp has been under the control of five administrations since the deed was accepted, and subjected to their varying interests. Funds were set

---

to failure to obtain the approvals. Under those circumstances, CST would get to keep Camp Arawak.

[15] This fact is borne out by the Governor's October 26, 1999 letter to President Richards wherein he allowed Act 23-0098 to become law without his signature. He said, "The severe economic plight on the island of St. Croix in particular, and the Territory in general, requires that the Government partner with private industry to create special incentives such as the one proposed by this legislation, which will provide business diversification, increased job opportunities and long-term financial benefits for everyone.

aside to implement a development plan, which was eventually abandoned. The Government did arrange for Arawak Program, Inc. to utilize the site for the benefit of community youths. This yielded positive results. The Government even contributed annually to the program. However, nothing major has been done with the Camp. The evidence suggests that minimal improvement would cost some $50,000.00. Commissioner Hobson testified that he cannot afford to improve Camp Arawak due to budgetary constraints. However, Senator Hansen, within a few days, garnered hundreds of people to clean up the Camp. The public interest in this case, and Camp Arawak, is extensive. Many were unaware that the Camp even existed, that it was charitable trust property for their benefit, or that it bore significant archaeological, cultural, and historical value. Now, they do. These circumstances, coupled with the necessary "will" of the Trustee-Governor and the people as a whole to develop the Camp, would likely yield positive results. Under the circumstances, the Court cannot conclude that the Trustee-Governor lacks capacity to adequately administer the Camp Arawak Trust. Removal is unnecessary.

In lieu of removal, pursuant to Plaintiffs plea for enforcement of the trust, this Court opts to supply the necessary "will" to reverse the neglect of Camp Arawak via an appropriate enforcement order. Plaintiffs' Complaint paras. 37, 42. This Court is of the view that if the people and government work together, in pursuit of a common goal. Camp Arawak can be transformed into a more elaborate park, beach, and recreational facility, or preserved as a well-maintained natural park. The historic structures can be protected, restored, and preserved for enjoyment and appreciation by the people of the Virgin Islands and their visitors. Camp Arawak can become a Great Park on Great Pond Bay. The people, and its government, need only will it so.

## CONCLUSION

For the foregoing reasons, this Court concludes that the 1974 conveyance of Camp Arawak to the Government created a charitable trust wherein the Governor and Legislature held equitable title in trust for the people of the Virgin Islands and its visitors forever. The specific purpose of such trust was that Camp Arawak would serve, forever, as a beach, park and recreational facility, and that the people would enjoy, in perpetuity, the land as well as the historic structures upon it. The proposed transfer of Camp Arawak is contrary to the trust terms and beyond the powers of

Trustee-Governor. Consequently, execution of the Exchange Agreement and pursuit of its implementation, by submission to the Legislature for ratification, constituted a breach. Act 23-0098 does not authorize the transfer. Instead, it attempts to ratify a non-existent agreement (i.e., one between the Government and CST) and is therefore irrelevant to this case. Neither the *cy pres* nor equitable deviation doctrines apply to this case since Camp Arawak is capable of utilization as a beach, park and recreational facility. Execution of the Exchange Agreement would cause Plaintiffs to suffer irreparable harm through loss of ownership, and deprivation of use of the Camp. This harm outweighs any harm to the Government or CST. The public interest favors enjoining the breach of a trust designed to benefit thé community. An injunction is necessary to prevent the irreparable harm upon Plaintiffs which would result from implementation of the Exchange Agreement. Under the circumstances, removal of Trustee-Governor, who is capable of adequately administering the trust, is unwarranted. Accordingly, this court will issue appropriate orders consistent with this opinion.

**Masonry Structure**

**Plywood Structure**

**Ruins**

A 15

**Master Plan** Scheme 1 4/9/99

Scale

CARIBBEAN SEA

A 14

97